Good morning. May it please the Court. May it please the Court. I'm Matthew Bishop, Counsel for Plaintiff Appellants in this matter, Friends of the Wild Swan. In these consolidated cases, actually if I may, I'd like to reserve 10 minutes of my time for rebuttal, if that works. At issue in this case is the Forest Service's decision to authorize two large logging projects in the South Fork of the Flathead River watershed, just south of Glacier National Park and adjacent to the Great Bear and Bob Marshall Wilderness Complexes in northwest Montana. The South Fork is a protected wild and scenic river and one of the most biologically rich and diverse places in the entire contiguous United States. It's home to a fully intact predator-prey system that's home to wolverines and includes protected core habitat for threatened grizzly bears and critical habitat for Canadian lynx. The main channel of the South Fork and a number of tributaries are also protected critical habitat for bull trout and a native stronghold for West Slope cutthroat trout. It's a special and unique place and the two logging projects at issue in this case are Spotted Bear River and Soldier Edition and they're located immediately across the river from one another. So Spotted Bear is on the west side of the river and Soldier Edition on the east side. The two logging projects include many of the same logging prescriptions and more aggressive regeneration logging, some burning, thinning, and road work to construct new roads, new temporary roads, and also reopen old closed roads. The two logging projects, also about roughly the same size, about 3,200 acres each, include many of the same impacts and they will also occur during the same three to six year time frame and use some of the same logging roads and we now know that some of the units from the logging projects have been packaged. Mr. Bishop, you mentioned they'll take place at the same time. Is there anything in the environmental assessment or other documents which have been used which tell us whether the logging on Spotted Bear will take place at the same time as the logging on Soldier 2 so as to cause sedimentation from the logging on Spotted Bear to take place at the same time as sedimentation that takes place on Soldier 2? Yes, Your Honor. In both of the environmental assessments, when they issued the decision notice for each, I think it was back in early 2012 for Spotted Bear and similar. The decision for Soldier Edition was issued maybe two months later. In both of those decision documents they talk about how the projects will be approximately three to six year projects that would start roughly around the same time. What's happened now, though, is that they actually took some units. We know, for instance, for the 10 mule timber sale, those are slated to occur this summer, starting June 1st and they will be logging one side. I think most of the units are in Soldier Edition and they're also going to be logging simultaneously those units on the Spotted Bear side as well. Is that a condition of the 10 mule lease that the logging take place simultaneously on the two projects? Or is that, you said it's a three to six year period, or can that be regulated so that logging can take place on one project, Spotted Bear, and then when that's finished, some logging takes place on Soldier 2? Yeah, they certainly could have structured that way, Your Honor, where they staggered it. Because they're concerned about sediment impacts, they could have required one logging project to occur first and then the other one go second or staggered, but they didn't do that in this case. Could we? I suppose you could, Your Honor. I did see that there's a plan of operations, for instance, in place right now for the 10 mule project. And the way it's structured, the logging on all those units on both sides will occur this summer. But that's only a small percentage of the Spotted Bear project. There are others. But you certainly could stagger it and require, and this is one of the things I think would be helpful if they actually take a look at the cumulative impacts, because they could have said, listen, certain times of year they might have low flow in South Fork. We've got this designated critical habitat for bull trout. Maybe let's do the burns on this side this year and hold off on the burns on the other side. Under what authority could we stagger the projects? Well, I think, Your Honor, the more appropriate remedy would probably be a remand to take a look at the cumulative impacts, and then it would probably be up to the Forest Service within their discretion to decide what they may or may not need to do in this case, because the claims that I am pursuing are procedural in nature, primarily, under NEPA and Section 7 of the ESA. But I do think this Court does have a lot of discretion to issue various types of equitable relief. But I think the more appropriate relief request would probably be a remand order to take another close look at it, maybe with recommendations or suggestions to stagger it. But it would ultimately depend on what they find as part of their analysis. I mean, here I think the main issue is they didn't really look at it. So, you know, things might change. And at the end of the day, their conclusion, for instance, that there are no effects, say, to the fishery, due to the flow in the main channel of the South Fork, you know, it might be accurate. But the issue here, which is just like the issue in the Klamenskiski-Hoovie BLM case, is there's just no analysis at all, which I think was really incredible when you think about the timing and the similarities between the projects and also the pristine nature of the environment there. And one point I would like to make regarding cumulative impacts on the fishery is that the optics have changed a little bit from the District Court to the Court of Appeals because opposing counsel in his briefs has now conceded that the main channel of the South Fork is actually part of the analysis area. At the District Court when we briefed this, because it was so unclear from the EAs, the argument was whether or not the main channel was actually within the analysis area. We were fighting over how they drew the lines. But if it's actually now part of the analysis area, then I think there's a long line of cases that this Court has issued, the Klamenskiski-Hoovie case, current BLM, where they have held that the analysis, if it's in the analysis area, it must take a hard look. You can't rely on general conclusory statements. You have to have some kind of quantified assessment. And I think here there really isn't one. And again, I keep coming back to Klamenskiski-Hoovie because in that case, it's very similar. You actually had critical habitat for a fish species. You had two adjacent timber sales occurring in the same watershed at the same time. I think this case is almost identical to Klamenskiski-Hoo in that sense. The second point I'd like to make, which is related, has to do with the Section 7 under the ESA claim that they didn't properly define the action area. And this is because even with respect to grizzlies and lynx, they only looked at the immediate project area when they drew the boundaries. But under the regulations implementing Section 7, which define the action area, the Forest Service is by definition to include all areas to be affected directly or indirectly by the federal action, and not merely the immediate area involved. I'm quoting 40 CFR 402.02. But again, they can see they only looked at the subunits in the immediate area and only at lynx analysis units in the immediate project area. They never considered, for instance, where displaced grizzly bears from the logging project may go. And there's a substantial amount of evidence in the record that both spotted bear and soldier addition will result in the loss of hiding cover for grizzlies, loss of secure habitat, increased human access, more roads, and displacement from the project area. And though it is cited in the briefs, I would like to draw this panel's attention to the biological opinion in the record. I'm citing looking at ER 490 to 506 in the soldier addition biop, where it discusses in detail how grizzly bears will be displaced from the project areas. In fact, they even issued an instant take statement because there will be take anticipated from each project. But again, they never looked at, if you actually do all this logging roadwork and spotted bear, where are those grizzlies going to go? And then also look at soldier addition and say, where are those grizzlies going to go? It might be that this area of the South Fork, which is extremely important for grizzly bears, that they might be displaced from both sides during this three to six year project. But again, they never took that into account. And I think this approach that the Forest Service used in this case is very similar to the approach that was rejected by this court in the Native Ecosystem Council of Udombek case, 304F3rd at 90. Notably, if this court finds that the Forest Service did not adequately define or explain how it defined the action area in violation of the ESA, then it was improper for the district court to balance the equities in this case when denying our request for a preliminary injunction. As explained by this court, the traditional injunction analysis does not apply to injunctions issued pursuant to the ESA. In cases involved in the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings to balance the parties' competing interests.  I'm citing the National Wildlife Federation v. NIMPS case 422F3rd at 793-794. The third and last issue I'd like to discuss here in my opening is the Forest Service's use of new internal guidance which changed the LINCS forest plan standard in the forest plan, which is referred to as VEG S6. And this change significantly reduced the amount of habitat to be conserved for LINCS. And the issue really boils down to how the term hair habitat is defined and measured. Under the forest plan standard, which is referred to as a LINCS direction in the briefs, which was subject to public review and comment, was analyzed in EIS, hair habitat for VEG S6 was defined using two variables, how many trees per acre, or stem density, and the age of the forest stand. And the Forest Service actually used GIS data to document and map all of this hair habitat in Montana, including the Flathead National Forest. And the total acreage estimates of hair habitat are actually discussed in the record at ER 563, and that's from the spotted bear excerpts. And they're also depicted on a map. What the Forest Service's new internal guidance did, and that's what that issue here, is it changed how hair habitat was defined and measured. Instead of using trees per acre, the Forest Service only used one variable, something called horizontal cover to define hair habitat. Horizontal cover is the amount of visual obscurity or cover created by vegetation, tree stems, snow, and the topography of the land. So under the guidance, the Forest Service uses these flags, they call them cover boards, and they go out and they stand in a forest stand, and they measure how much of the flag is covered by the branches or the trees, or the snow, or the vegetation. And if they come back and say that the measurement falls below 35%, then that forest stand, even if it's occupied by lynx or hares, even if it's in critical habitat, is not considered hair habitat, and the lynx conservation measures don't apply. If the stand measures more than 35%, then it does. This new approach, however, was never submitted for public review and comment, never analyzed in either of the EAs or in the EIS, and it significantly reduces the amount of habitat subjected to the lynx direction. Mature, multi-storied forest stands were basically dropped from all lynx management and VEG S6 because they fell below the 35% threshold. Forest stands, like many of those at issue in this case, were deemed not to be managed for lynx because, again, they fell below the guidance, below the threshold. The Forest Service certainly does have discretion to change the standard in the lynx direction, including how hare habitat is measured and defined. We would have conceived that. And it may make sense to make the changes as new studies and science emerge, but if the Forest Service wants to make changes, it has to go through the proper procedures and amend the lynx direction to comply with NEPA and the National Forest Management Act. It can't make these major changes behind closed doors that it did in this case. The Ninth Circuit, this Court, has not ruled precisely on this issue, but I found the District Court of Oregon in the ORNRC v. Forsgren case, 252 F sub 2nd, 1088, has ruled in a very similar issue, and I think the reasoning is persuasive, and I ask this Court to consider and adopt it. I'd like to reserve the remaining time I have, if that's okay, 15 minutes for rebuttal. All right. Thank you. Thank you. Good morning, Your Honor. My name is Matt Littleton, and I represent the Forest Service and the Fish and Wildlife Service in these two cases. I'd like to start. There's a lot to talk about on the merits here, but I'd like to start by reminding the Court that we're here on the denial of a preliminary injunction, which is an extraordinary remedy that was denied by the District Court. That denial is reviewed for abuse of discretion, and the plaintiffs have not, as the District Court found, demonstrated any of the four factors required to meet the demanding preliminary injunction test. The first of those, and the one that has consumed most of my opponent's time in the opening, is the merits of the case, and I'll start with that now. Serious question. And I don't know about my co-panelists, but for me the cumulative effects issue comes closest to raising a serious question on the merits. So I'll start with the cumulative effects, but within that I want to specify there are a lot of different claims here. There are cumulative effects with respect to grizzly bear, lynx, and bull trout, and I'd like to explain why the Forest Service adequately considered cumulative effects as necessary with each of those species. I'll start with the grizzly bear. The plaintiff's argument there is that the bear management subunit level analysis that the Forest Service did for both of these projects was insufficient, that under past Forest Service precedent it needed to consider the entirety of the 400-square-mile bear management unit to analyze the effects of these two projects, even though these two projects, as has already been discussed, only affect five square miles. And in any kind of cumulative effects analysis, there's a balance. On the one hand, the agency needs to be sure to consider a wide enough area to take into account all of the potential impact. But on the other hand, the area can't be too large because then any impact seems comparatively negligible. And the bear management subunit level analysis, which covered an area in both cases about 25 times the area of direct impacts, the Forest Service deemed was reasonably large enough as opposed to the bear management units, which would have been 160 times. Could you point us to where in the biological opinion the effect of both projects was considered, vis-a-vis the grizzly bear? Certainly. So in the soldier edition record, it's in the supplemental excerpts at page 433. One page? 433. I said, so is it your representation that the cumulative effects analysis was only on one page? That's the principal place in the cumulative effects worksheet in which the two projects were deemed to – the analysis took place on that page, yes. And that sufficed to constitute a hard look at the cumulative impacts. What that page says is very important, which is there's a large amount of contiguous grizzly bear habitat in both of these areas that will not be disturbed. Grizzly bears are wide-ranging carnivores that are free to move not just within these two project areas, but all in the surrounding area. And that acreage was quantified in the cumulative effects analysis, and it was determined that the only possibility for cumulative effects was on increased use of a haul route. I don't have that site in front of me, but that's in the EA, and there's no allegation from the plaintiffs that there was any problem with that cumulative effects analysis. The habitat part of it. For which species, Your Honor? Any or all. Okay. So with grizzly bears and lakes, I want to also point in the spotted bear record to the supplemental excerpts at 551 to 552, which in spotted bear context point out that there was no reason to think that there would be cumulative impacts from these two projects. And you need to keep in mind, Your Honor, that this is not the situation where you've got two projects that are, you have five square miles condensed on each side of the river where effects are happening at the same time, although the impact areas are only five square miles. These are spread out over a very large area. So one logging might be going on 20 miles away from another timber sale logging at the same time, and there's no reason to think, the plaintiffs haven't come forward with any reason to think there's going to be a cumulative impact. Did the EA discuss the possibility of both projects, both of them involve creation of roads or re-blading old roads, removal of material, which to my untrained eye would suggest that there would be sedimentation going down into the river. That's discussed in the EA, right? Yes, and let me talk about sedimentation. I'll just tell you what my real concern is, and that is, can you tell us where in the EA it tells us that the Forest Service considered what would happen with sedimentation if both projects occurred at the exact same time? I can do that, Your Honor, but I want to specify that sedimentation is only a concern with respect to bull trout. There is no allegation that the plaintiffs have made that grizzly bear links are going to be adversely affected, and I should also point out that on page, in the Soldier Edition record at the Supplemental Excerpts, page 114, and the Spotted Bear Record Supplemental Excerpts, page 225, it's made clear that in the context of both projects, there was no expected sedimentation from any timber harvest. So timber harvest is not a concern with sedimentation at all. So even if this Court were to determine that there were a problem with sedimentation, there would be no basis for enjoining any timber harvest on either side for either project. So what would the sedimentation concern involve? Which actions or activities? So the sedimentation, and this is in the, again, at the record pages I just cited to you, but also in the Spotted Bear Record at Supplemental Excerpts, 210 to 211, and the Soldier Edition Supplemental Excerpts at page 110, the Forest Service extensively explained concerns with sedimentation and determined that the overwhelming majority of possible sedimentation would be caused by the highly unlikely event of a high-intensity rainstorm immediately following a prescribed burn. So what the plaintiffs are arguing is that the Forest Service failed to take into account, with respect to bull trout, the possibility of every prescribed burn in both projects taking place around the same time, and in all cases, an immediate, rare, less than, I think it's .1% probability, high-intensity rainstorm occurring, so that all of that sedimentation would flow simultaneously into a seven-mile stretch of the South Fork of the Flathead River. Now, that seven-mile stretch was considered for the purposes of cumulative effects analysis in both projects, and the citation for that in the Soldier Edition Project is Supplemental Excerpts at page 125, and for the Spotted Bear Project, Supplemental Excerpts at page 227. It was within the analysis area, and the Forest Service determined in both cases that the principal concern with sedimentation was adverse impact to spawning and rearing habitat for bull trout. And the plaintiffs have conceded at page three of their reply briefs that there is no spawning or rearing habitat for bull trout in that seven-mile stretch, and that's also indicated in our response brief in a number of places. Doesn't the bull trout come up from the reservoir for foraging purposes below the juncture of the rivers? I mean, north of the juncture of the rivers. So the bull trout travels through the reservoir up through that seven-mile stretch as an adult to get to the spawning grounds. Is it affected by sedimentation? So there is an allegation, again, in the reply briefs. The plaintiffs bring up the idea that all of this, again, extremely unlikely sedimentation effect would occur at the same time during that seven-mile stretch, and it could cause respiratory problems for the bull trout. What I have a little difficulty with is the two biological assessments involved here with respect of the area. I'm looking at one that you just cited now, SER 125, which tells us the cumulative effects area analysis on the soldier addition treats the south fork as the eastern boundary of the cumulative effects analysis area. If you take a look at the same document with respect of the soldier two, I have it here. I have to spot it. It has, as I remember it, the same language almost with respect of the eastern area being also the creek. So it can't be that way. Is there a misprint there? Your Honor, it's a bit ambiguous there, but I want to point, Your Honor, to later in the same paragraph which you quoted from on the soldier addition record. This is at Supplemental Excerpts, page 125. Right. The last sentence of that, or excuse me, the penultimate sentence of that paragraph says, in addition, there is a very short reach, and that's the seven-mile reach, of the south fork in the analysis area before it enters the Hungry Horse Reservoir. Well, I think the position of the appellants is that instead of considering the sedimentation problem from the soldier two on the west and spotted bear on the east, individually with a limit being the south fork river, they should have considered both areas and the sedimentation, which would converge under the circumstances which are indicated if you have a simultaneous burn and a rainstorm, and that wasn't really done. Well, I would point, Your Honor, to in the soldier addition record page, Supplemental Excerpts, page 129, where the Forest Service indicated that even if the worst-case scenario occurred with respect to the spotted bear project, so this is the other project, there still wouldn't be a natural, or there still wouldn't be sedimentation outside the natural range of variation. As to one project, but they didn't consider if the worst-case scenario took place as to both projects simultaneously. There is not a place in the record, Your Honor, I concede, where the Forest Service said if the worst-case scenario occurred with respect to every prescribed burn unit, which I should clarify that... If there were a rainstorm, it would probably cover both areas, right? Right, but that assumes that every prescribed burn is happening at the exact same time. Well, is there anything in the environmental assessment which requires the burns not to take place simultaneously? There's not, but again, we're here on a preliminary injunction, and the evidence in the record indicates that the prescribed burns that were intended to take place in the immediate future were only, I think, a third of the total prescribed burns. And so even if that were enough on the merits, it's not enough to justify the extraordinary remedy of enjoining the limited activities that are taking place. And there's no indication that I have, Your Honor, that the Forest Service has planned to do all of these prescribed burns at the same time. With respect to what you just mentioned, evidence in the record showing that only one-third of the prescribed burns would take place at any one time, is that what you said? Again, this is evidence from the 2013 season, which is when this motion was brought, and I'd point the Court to it. Excuse me, I'll get the citation. In the Soldier Edition Record Supplemental Excerpts, page 224, which indicates that there's a plan to burn during the entire season, not necessarily at the same time, burn Units 1, 2, 4, and 7. And with respect to the Spotted Bear Record Supplemental Excerpts, pages 48 and 49, which indicates a plan to burn only two of the prescribed burn units, Units F and K. The other thing on this point, I would say, is that this is not an Endangered Species Act issue. This is only a National Environmental Policy Act issue, because under the Endangered Species Act, as we cited in our brief, there is no obligation where the agency determines that there is no likely adverse effect from a project. There's no obligation under the ESA to do a cumulative effects analysis or determine the environmental baseline. And the plaintiffs come back and dispute that in their reply brief, but I would just point the Court to pages, or excuse me, to 50 CFR 402.13 and 402.14, which indicate that in a situation like this, where there's only an informal consultation with the Fish and Wildlife Service, there's no obligation to do a cumulative impacts analysis. So if this Court... Your point, Mr. Littleton, the documentation, the evidence on the motion for preliminary injunction is such that there is no evidence of a plan to do the burning simultaneously, which raises the specter of sedimentation from the combined projects. There's no indication that all of the sedimentation would happen at the same time. That's right. And the plaintiffs, again, it's their burden, and because this is only a NEPA issue, there's no argument that the other winter factors don't apply, and that's from Monsanto versus Geertsen Seed Farms. This is only a...  but also imminent irreparable harm, and they would fail to do so on this record. And I would also point out on that issue with irreparable harm, and specifically with respect to sedimentation and bull trout, if you take a look at the plaintiff's standing declarations, which are the only declarations submitted in the spot-of-bear record, for example, this is in excerpts, pages 99 to 119, the focus there is all on the forest. It is not on the river or impacts to bull trout. And the plaintiff's briefs at page 50, both of their opening briefs, only allege irreparable harm to the forest, not the sedimentation issue. So, again, the showing of irreparable harm, as the district court correctly found, was not met here. And so in that instance, the court, in fact, need not even address at this preliminary injunction stage the likelihood of success on the merits. Counsel, may I ask you to give me a pinpoint citation to 50 CFR 402.14, where it says there is no obligation to do a cumulative effects analysis? So 402.14 deals with, I believe, I may be mixing this up. It says formal consultation. Right. So is that what you meant to point us to? Yes, so 402.13 and 402.14. 402.13 has to deal with informal consultation, and 402.14 is formal. Formal is not what happened here. So we're saying that the requirements in 402.14 are not applicable to bull trout. So what's only required is 402.13, and 402.13 does not require the sort of cumulative effects analysis that plaintiffs are alleging needed to be done here. I'd like to turn to some of the other issues here, and to go back to grizzly bear and lynx. With respect to both of these issues, there doesn't seem to be a claim from the plaintiffs that the lynx analysis units or the bear management subunits were improperly drawn, because these units, there's a ton of work that went into these over an extended period, using the best available science to draw boundaries that were objective and could be used to assess effects of an individual project, and that's what was done here. And what the plaintiffs are saying is, well, you should have considered every bear management unit, and that's just, again, it's an impractical standard. And for lynx analysis units, the plaintiffs suggest at their reply brief on page 13 that for lynx, perhaps the Forest Service should have considered what they call an upside-down boot, which is an enormous swath. I mean, it's almost half of northwest Montana for a Forest Service project that was designed to impact five square miles only. And that's just an unreasonable standard, and in fact the Forest Service would be vulnerable on NEPA grounds were it to use that broad an area, because the impact to lynx would be deemed negligible. And the cumulative effects, as I've discussed already in response to Your Honor's questions, were considered and addressed for both of those species at supplemental excerpts, page 433. Even though it was not required in your view? It was required for lynx and grizzly bear, not for bull trout. I see. Because for lynx and grizzly bear there was a determination that it may be likely to adverse effect in both cases, but for bull trout it was not. So just so I understand your argument, so the sedimentation issue affects only the bull trout. That's right. And the bull trout is not endangered, so the cumulative effects analysis wouldn't be required. Is that your argument? Not quite, Your Honor. The bull trout is listed as threatened under the Endangered Species Act, and so there was an informal consultation that needed to take place. But because the Forest Service determined in the case of both projects that each project was not likely to adversely affect the bull trout species, there was no need to get to the obligations in Section 402.14, which I've already cited Your Honor to. I would also point the Court to its decision in Conservation Congress, which is cited in our brief that explains that these obligations are not required for an informal consultation. So with respect to, and I'd like to go to the. So is it your position that this was an informal consultation and no cumulative effects analysis was required? Or is it your position that because there had been a determination that the species weren't affected, there was no need to do a cumulative effect analysis, cumulative effects analysis? I'm a little bit confused about where your position is. So those are actually, our position is that those two are the same, because the reason that only an informal consultation was necessary is because of the not likely to adversely affect determination. So then why was a cumulative effect analysis done? Your Honor, a cumulative effect analysis, this is only under the Endangered Species Act that we're talking about. I'm not saying that it wouldn't be required under the National Environmental Policy Act. The reason I'm making the distinction here is that the plaintiffs have an allegation with respect to the ESA that none of the other winter factors should be considered because of some past case law from this Court. Now, we dispute the relevance of that case law to a procedural injury like this, but we're saying for bull trout, it doesn't matter because you're only looking at NEPA. And so, yes, cumulative effects analysis was required for bull trout under NEPA. We think the cumulative effects analysis was adequate in light of the large dilution, large dilutive effect of the large South Fork River for both projects. But even if this Court were skeptical about that, it would still need to look at the other winter factors. And as I've already explained, the plaintiffs haven't demonstrated, made a clear showing of substantial proof of imminent irreparable harm from prescribed burning that would need to take place simultaneously and have this, you know, once in a very unlikely rainstorm to even take place. So what I'm saying is that issue is extremely narrow, and the remedy that would be awarded if it were appropriate would also be extremely narrow. I want to get to the standard VEG S6 for links, which the plaintiff also brought up in his opening presentation. And here, I think it's appropriate for the Court to have the standard in front of it when it's analyzing this question. So in the soldier edition record at supplemental excerpts, page 386, that's a verbatim citation of the standard VEG S6. And there's a note at the end of the standard, and I'll read that now. It's, timber harvest is allowed in areas that have the potential to improve winter snowshoe hare habitat, but presently have poorly developed understories that lack dense horizontal cover. So the dispute here is a scientific one over what constitutes dense horizontal cover. And I point to two places in the record, one for soldier edition, supplemental excerpts, pages 260 to 261, and for the spotted bear record, supplemental excerpts, page 553, where the Forest Service explained the scientific disagreement with the plaintiffs about what constitutes dense horizontal cover. I would also point out that the plaintiffs have suggested that the cover board method that they're protesting was something that was used as the only method to evaluate appropriate hare habitat for timber harvest. That's not the case. There were a variety of sources used to assess what constitutes snowshoe hare habitat, including satellite images, Forest Service Geographic Information System, or GIS mapping, visual examination, forest stand exams, walkthroughs in 2009 and 2010. All of that is documented in the environmental assessments at page in the soldier edition record. I apologize for continuing to give you these specific sites, but because of the complexity of this case, it's important to have the information in front of the court. In the soldier edition record, supplemental excerpts, page 468, and in the spotted bear record, supplemental excerpts, page 457. All of those sources of information were used to evaluate hare habitat. In response to comments from the plaintiffs on the environmental assessments in both projects, that a few specific units were going to be, they thought were appropriate hare habitat and shouldn't be treated, the Forest Service went out and cross-checked those particular units using the cover board methodology that the plaintiffs are upset about. And our position is that that was a reasonable cross-verification method, and there's nothing in the links management direction or in standard VEG-6 that prevents that. The plaintiffs have suggested that the links management direction sets an affirmative definition of what must be used to evaluate dense horizontal cover or snowshoe hare habitat. That's not the case, and we point out in our brief several places where that's made clear. I also want to finally address, which the plaintiffs did not in their opening presentation, but briefly address the claim with regard to fisher, which is not a species listed under the Endangered Species Act, but is a sensitive species that needs to be addressed in these EAs. The plaintiffs have suggested in their reply brief that there's no evidence that fisher were hard to monitor. We dispute that strongly, and for that I'd point the court to the spotted bear record, supplemental excerpts, pages 95 and 96, listing several sources of data that the Forest Service tried to use to determine whether the population was in decline. It determined there wasn't. The plaintiffs haven't come forward with any data that they suggest the Forest Service failed to examine. And so the only question is whether it was reasonable in that context to use fisher habitat as a proxy for fisher. And as this court said in lands council, and at footnote 9 of the Tidwell decision, which plaintiffs cite, just because if a species is hard to monitor, the Forest Service doesn't have to undertake an extensive examination to find fisher in a project area, however small, that's simply not required under the National Forest Management Act. I'd like to briefly get to the other winter factors. Irreparable harm I've already discussed with respect to bull trout, but with respect to the other species, again, there's no allocation that these species are going to be put in jeopardy. These species have very large ranges in the area, and as counsel in his opening indicated, these are small percentages of the overall forest. And, in fact, with respect to the immediate irreparable harm, the tin mule sale is only a small percentage of the overall project. And so, again, to get a preliminary injunction, there would need to be a clear showing that there was going to be imminent harm from the tin mule project. We don't think that's been met here. And the benefits of the project, including reducing wildfire risk, which, by the way, would drastically increase sedimentation, because wildfires, when they run, don't care about whether there's going to be imminent rainstorms happening, whereas the Forest Service can take that into account in determining where to burn. Wildfires don't, and so it actually would reduce the risk of sedimentation by having these prescribed burns take place. There's also the reduced pine beetle infestation risk, safety hazards, benefits to the local economy. The District Court took all of these into account and did not abuse his discretion in determining that a preliminary injunction was not warranted here. Unless the Court has further questions, I would just sum up by saying that the plaintiffs haven't shown that anything is missing from these extensive analyses. We've explained why in our briefs. Anything that's required. Anything that's required is missing. That's right. And we explain in our briefs that this isn't a situation where the Forest Service was looking at these two projects potentially at the same time. One of these projects was proposed far before the other one, and the question the Forest Service faced was, was there any reason to redo the extensive environmental analysis for one project to take into account the other project? The Forest Service looked at the possible cumulative impacts, determined that they were not significant, and therefore determined to proceed separately with the two projects. The Forest Service complied with NEPA by taking a hard look at the impacts. It complied with NIFMA, and it complied with the Endangered Species Act. You say they looked at the cumulative impacts. They looked at the impacts of both projects. They looked at the cumulative impacts. The problem I'm with here is that the definition of the areas as to the runoff and the sedimentation was done per area, not together. There was never that I could find, and please help me if you can, is there anything in the environmental assessments which indicates an attempt to see both areas at one time if there were simultaneous burning or logging? Well, the only place where both, and plaintiffs haven't contested this, the only place where there could possibly be cumulative impacts is in that seven-mile stretch of the South Fork. There's no indication that the cumulative impacts would extend to the different upstream watersheds. So we're just talking about the seven-mile stretch, and I pointed, Your Honor, earlier in the argument to places where it's clear that, again, soldier additions, supplemental excerpts, page 125, spotted bear, supplemental excerpts, page 227, where that seven-mile stretch was included in the analysis area for both projects. So the cumulative impacts area, the plaintiffs initially said that that was... I'm looking at SR 125 just a little, and I'm having difficulty finding any language which tells me that in the soldier addition number two, which is what you talked about, there is a consideration of water coming from the spotted bear project. Could you help me with that? So in the soldier addition record at SCR supplemental excerpts, page 129, it refers to possible impacts from the spotted bear project, which has been proposed. The first full paragraph. The summary of cumulative effects? No, the farther up, Your Honor, the first full paragraph on that page. The proposed spotted bear project... Yes. ...is currently... It says spotted bear river project is currently in the planning process. That's right. Tell me what about that tells me about... These activities referring to spotted bear project as described in the environmental assessment for this project should not cause a measurable increase in water yield, sediment yield, or nutrient levels outside the natural range of variation for the streams in the spotted bear project cumulative effects. Now, that's what you're talking about. Yes, and the spotted bear project cumulative effects analysis area, which is referred to there, is at supplemental excerpts in the spotted bear record, supplemental excerpts, page 227, which indicates that that cumulative effects analysis area includes the seven-mile stretch. Okay. Thank you. Thank you, Your Honor. Thank you, counsel.  Thank you. There's a lot to cover. Let me start by saying that the cumulative impacts issue with respect to the native fishery does include bull trout, but also native cutthroat trout. And they travel up and down the main channel of both spotted bear and south fork between the Hungry Horse Reservoir and the various tributaries. And the impacts are not just responding, but there's a significant amount of information in the record talking about how sediment is the number one concern when it comes to native trout, both bull trout and west silt cutthroat trout. And even at small doses can cause trouble in terms of loss of food availability, decreases in insect production, interference of respiration, clogging of gills, et cetera. Is it your position that what Mr. Littleton just pointed me to on SER 129 is insufficient to show consideration of the cumulative effects of sedimentation? There's no cumulative effects analysis about how soldier addition to and spotted bear will cumulatively impact the native fishery. If you're referring to SER 129, that's the spotted bear EA, and it's saying that spotted bear will likely by itself not cause cumulative impacts. But there's no quantified assessment placed in either of the EAs where they actually say, okay, here's the burning that's going to occur on this side, here's the road work and burning on the other side, and here's the potential for a queue of impacts to the main channel, and therefore it's not a problem. When they talk about it, they only talk about it in the context of one project, Your Honor, at a time. So opposing counsel's position is that the plaintiffs did not advance any evidence that would indicate that the projects would proceed at the same time and thereby have the cumulative effects. What's your response to that? Well, I think, Your Honor, the opposing counsel would likely concede that the 10-meal timber sale, which pulls units from each project, is going to proceed this summer, which is at the same time. That's from both projects? There's some units from each project in the one sale. I know it can get confusing, but both sides of the South Fork will be logged this summer. And the decisions themselves authorize both projects to be implemented over the same time frame. There's nothing to limit or restrict or stagger when it's done. What's your response to opposing counsel's representation that there would be disturbance of the sediment only if the burns happened to take place and were immediately followed by an unusually strong rainfall? Do you agree with that? I would agree that in the EA they determined that the bulk of the sediment loads during a worst-case scenario would come from a major rain event after a prescribed burn. But there is still a significant amount of sediment coming from the roadwork. I mean, we're talking about tons. So the estimates for Spotted Bear was roughly, I think it was 5,800 tons. A lot of that was post-burning, but also the roadwork. And some of the roadwork, by the way, is occurring upstream from Spotted Bear. So most of the sediment is coming in the seven-mile stretch, as has been talked about. But there was a significant 1,400 tons coming from upstream, where actually both projects will have the potential to discharge. Would that be also due to rainfall, after rainfall, that the sediment from the road would be deposited into the stream? Rainfall is certainly a problem. But also they're going to go in there and upsize a lot of the culverts. They're going to actually get into these tributaries and pull old culverts out. So there's lots of sediment discharges that can happen during that. And also just road maintenance and construction work also results in a fair amount of sediment. A lot of these roads cross the tributaries up in the headwaters. The difficulty for me with this case is that we are on review of a preliminary injunction. And so the standard is extremely high for us to be able to overturn the district court's decision. You think you meet that high standard? We do, Your Honor. We believe that the district court abuses discretion on irreparable harm issue, because my clients, actually, who live near the project area, they never looked at how the project may harm their interests or the environment. What they said was, well, clients are interested in old growth habitat. Well, it's more than just that. My clients enjoy the dense, mature forests. They raise concerns about the hair habitat and compliance. I think a lot of it was skewed by the fact that they thought we weren't going to win on the merits or wasn't even a likelihood of winning on the merits. And, therefore, they didn't really, and they confused some of that with the irreparable harm inquiry. For instance, they said, well, they're not going to be cutting a lot of mature forest hair habitat, so, therefore, there's no irreparable harm to my clients, because those are the only forest standards they use, when the fact is the allegations are much more broad and general than that. In your honor, I do want to address a few other issues. Opposing counsel did cite some of the QMFX worksheets, but those are just the worksheets that basically say we need to analyze these impacts in the EA. In fact, I think those worksheets are more helpful to our case than they are to opposing counsel's. They also said they had no reason to look, with respect to grizzly bears, beyond the immediate project area. As we discussed in the briefs, we're talking about MS1 habitat for grizzlies, which is the most important on both sides. They're both in the same bear management unit, which the Forest Service and Fish and Wildlife Service determined to be an ecologically relevant area, in both the recovery plan and the biological opinions. Again, this didn't come out in the briefing as much, but they did form a consultation on both grizzlies and lynx, due to each of these projects. With respect to the Section 7 ESA issue, I think it's really important for this panel to realize that there's some confusion about what cumulative impacts mean under NEPA, and what cumulative effects mean for the purposes of the ESA. Other federal actions, which is what I issue here, we have two large federal projects, are not analyzed as cumulative effects under Section 7 of the ESA. The other federal action is part of the environmental baseline, and has to be analyzed as part of the effects of the action. This is spelled out in this Court's Native Ecosystem Council v. Dombek case, which is entirely consistent with this Court's later decision in Conservation Congress. I think it gets confusing when opposing counsel refers to cumulative effects. It's not a cumulative effects issue under Section 7. It goes to the environmental baseline. Here, they should have included the other project in the environmental baseline, and they didn't do that. Regarding the VEG S6 standard, it's not an issue of scientific disagreement. What they did is they made major changes and amended the forest plan standard without any review or oversight. It's difficult to quantify exactly what this meant, but it is a significant reduction. A good example, I think, from the record is a photograph of lynx habitat at ER 582, sort of the perfect forest stand for lynx. That's always under the lynx direction. You would call that lynx habitat, and it would be managed for lynx. Under this new internal guidance, that same forest stand may not be managed for lynx. If you look at the photo at ER 648, I'm citing from the spotted bear excerpts, under the new guidance, if it comes in at 34 percent horizontal cover, it won't be managed for lynx. If you compare those two photos, it's almost an identical forest stand. One is managed for lynx, and one may not be. I think that's helpful. Finally, on the Fisher issue, which is discussed, I felt, thoroughly in the briefs, I think it is hard to understand how the Forest Service can reasonably say that they are maintaining viable populations of a species by providing a certain amount of habitat, when that species hasn't been detected in the project area for over 15 years. It might be one thing for a year or two. They are a low-density species, but so are wolverines, and so are lynx. They may not pick it up for a year or two, but for 15 years, they've used winter tracking surveys, trapping data, and DNA hair samples, and they can't find any fisher at all in Flathead County. Its last one was detected in 1996. Before, back in 1990, the South Fork had the highest hits of fisher.  They might be gone. The problem isn't so much with the monitoring methods, and that was the issue in the McNair cases, where they were talking about flammulated owls. They weren't sure where to put the nesting boxes, and therefore there wasn't a lot of science on owls. So that might have been the reason you didn't pick up owls. Here, there are well-established methods for tracking and documenting fisher and other forest carnivores, and they're just not seeing it. Now, this isn't to say that they can't necessarily proceed with the project, but if they're going to go ahead and basically regeneration harvest 800 acres of fisher habitat and say fisher are fine because they've got sufficient habitat in the area, well, I think that that methodology needs to be reasonably reliable and sound, and it's just not when the species is gone. So we would ask the court to remand this back and have them reevaluate the fisher analysis. In light of this court's decision, and Native Ecosystems Council v. Tidwell, we think it's an identical situation. I wrote that. I'm not sure. Yeah, I'm aware of that, Your Honor. One final point I'd like to make on the balancing is this. This is a public resource. This is a national forest land. It belongs to the American public, and it's managed by a federal agency. On the one hand, all we're asking for today is that this panel preserve the status quo until the district court can issue a final decision on the merits or until the agency can bring its actions into compliance with the law. They noticed this project back in 2009. They say it might take six years to implement. A temporary delay to ensure it took a hard look at the impacts of grizzlies, lynx, and native fishery in this special part of the country doesn't seem like a weighty request. Why not wait and see? The whole point of NEPA and a lot of these environmental laws is to look before you leap. All we're asking is a temporary timeout to ensure they fully comply with the law on this public land in this special place. I think in terms of balancing, if you were to balance, I think that weighs in favor of an injunction. With that, I'll conclude unless you have any other questions. It appears not. Thank you, counsel. Thank you. Thank you to both counsel for a well-argued case. The case is already submitted.
judges: Hawkins, Rawlinson, Bea